HIRAM WALKER & SONS, Limited, v. CORNING & CO. et al.

(District Court, N. D. Illinois, E. D.   September 30, 1918.)

No. 591.

1. TRADE-MARKS AND TRADE-NAMES ⬅═93(3)—UNFAIR COMPETITION—SALE OF
WHISKY FOR REFILLING BOTTLES OF ANOTHER MANUFACTURER—EVIDENCE.
    Defendant *held* chargeable with fraudulent unfair competition in trade
on evidence that complainant had for many years sold its whisky in the
United States in bottles only with labels bearing its trade-mark of
"Canadian Club Whisky"; that defendant since 1908 has made a whisky
branded "Canadian Type," similar in proof, color, and flavor to complain-
ant's, which it sold only in bulk to wholesalers and jobbers, with the
knowledge and intention that it would be resold by them to retailers for
refilling complainant's bottles; and that it was chiefly so used, the brand
being practically unknown to and never called for by consumers.

2. WORDS AND PHRASES—"MISSIONARIES."
    The term "missionaries," as used in the liquor trade, applies to men
employed to visit saloons throughout the country and puff liquors of
particular manufacture, so that salesmen of wholesalers and jobbers
will find the way prepared for them.
    [Ed. Note.—For other definitions, see Words and Phrases, First and
Second Series, Missionary.]

In Equity.   Suit by Hiram Walker & Sons, Limited, against Corn-
ing & Co., Louis Abel, and Joseph Abel.   Decree for complainant.

Defrees, Buckingham & Eaton, of Chicago, Ill., and Lucking, Helf-
man, Lucking & Hanlon, of Detroit, Mich., for complainant.

Herbert J. Friedman, Isaac H. Mayer, and Robert H. Parkinson,
all of Chicago, Ill., for defendants.

BAKER, Circuit Judge.   Infringement of trade-mark, simulation
of labels, and direct fraud in refilling plaintiff's emptied bottles with
Corning & Co.'s imitation of plaintiff's "Canadian Club Whisky," are
the matters charged.

Part of the evidence was testimony given in open court, part was
exhibits, and the remainder was in depositions.

[1] In finding the facts from the oral testimony, I have been guided
by the appearance and demeanor of witnesses, their interest in the out-
come of this suit, and the apparent degree of their intelligence, in-
tegrity, and candor.   In weighing the testimony of deponents, I have
considered the intrinsic probability or improbability of the matters
they narrate, and particularly whether such matters are credible or
incredible, in the light of the facts I find from the oral testimony.

Against Abel and Abel the charge of direct fraud is supported by
the oral testimony of two detectives, Arthur and Arthur.   One was
regularly an insurance man; the other, a contractor.   They were
specially employed by a detective agency to investigate the refilling of
plaintiff's bottles.   Testimony of detectives is to be scrutinized with
care—care amounting to suspicion.   Even so, I find the detectives
more disinterested, more reliable, more credible, than the witnesses
against them.

[2] Against Corning & Co. the charge of direct fraud is supported, at least partially, by the oral testimony of Wishman, Naumann, and Pfeiffer, and by the established sales methods of the Abels and of Corning & Co.'s New York "House Account," as orally testified to by Detective Gleason, and is supported completely and explicitly by the depositions of Craig and Blake. These men, with numerous others, were employed by Corning & Co. to go to saloons throughout the country and puff that company's liquors, so that salesmen of wholesalers and jobbers would find the way prepared for them. In the liquor world these puffers are called "missionaries." In many collateral particulars the testimony of Missionaries Craig and Blake is discredited. They in fact were not such glowing successes as boosters as they pictured themselves. Even through depositions it is easy to see their tendency to exaggerate. They might not hesitate at the lie direct. In short, they are the kind one would expect in liquor boosters. But on that basis their title to credence is at least as good as that of missionaries, salesmen, and bartenders, who testified in person. Craig's and Blake's positive statements respecting Corning & Co.'s sales methods remained unshaken on cross-examination. I accept those statements, first, because they accord with the facts already established by the oral testimony of witnesses hereinbefore named; and, second, because they are inherently probable in the light of the liquor trade situation shown by the record.

From the beginning of distillation in Canada there have been numerous kinds of whisky having widely different characteristics of proof, color, and flavor. In Canada the word "Canadian" would cover all whiskies as generally as would "American" in this country. For many years prior to 1891 plaintiff, a Canadian distiller, exported to this country and here built up a nation-wide trade in its brand "Canadian Club Whisky," which had a distinctive proof, color, and flavor, and was sold only in labeled bottles. In 1891 plaintiff duly registered here its trade-mark and label. Prior to 1908, when Corning & Co. began the acts complained of, other Canadian distillers were exporting here some amount of whisky having the general characteristics of "Canadian Club." But in 1908, as well as before and after, plaintiff had four-fifths of that trade, and the remainder was practically all taken by "Segram's" and "Gooderham & Worts'." Though since 1900 "Segram's" and "Gooderham & Worts'" put the word "Canadian" on their labels, the word was so subordinated, and the labels were so distinctive in prominent names, colors, and designs, that no confusion arose. When drinkers at bars wanted "Segram's," they called for it by that name; when they wanted "Gooderham & Worts'," they called for it by that name, or simply "G. & W."; and when they wanted plaintiff's product, they asked for "Canadian Club," or simply "Canadian," or "Canuck."

In 1908, and before and since, there was a general practice among saloon keepers and bartenders of refilling bottles that bore well-known brands with cheaper whisky and then selling it over their bars, as the original contents. One witness testified that 90 per cent. of whisky retailers indulged in this practice. I find nothing in the record that

should cause me to reject his estimate. This refilling practice was a matter of common knowledge in the liquor world.

In 1908 Corning & Co. tried methods of distillation that were then new to that company. The result was a whisky which in proof, color, and flavor was a duplication of plaintiff's "Canadian Club." Corning & Co. called it "Canadian Type." As plaintiff's process and product were not patented, Corning & Co.'s act of making a like whisky was legitimate. But, instead of offering it in distinctively labeled bottles, so that drinkers who desired whisky of that proof, color, and flavor might know they were being given a competitive choice, Corning & Co. sold it only in bulk, and only to wholesalers and jobbers. At Abels', and at Corning & Co.'s New York "House Account," the detectives found Corning & Co.'s customers explaining to supposed retailers that no one could tell the difference between "Canadian Club" and "Canadian Type," and that the latter could be safely used in refilling "Canadian Club" bottles. The acts of those purchasers from Corning & Co. were in line with what Craig and Blake testified were the instructions of Corning & Co. to them. The oral testimony of other missionaries and salesmen, that they sold Corning & Co.'s said whisky only to those wholesalers and jobbers who insisted on having it, is not accepted, first, on account of the appearance and demeanor of those witnesses; and, second, because their declared attitude is improbable, in the light of established circumstances.

How was a trade of $75,000 a year built up and maintained, except by sales like those proven by the detectives and under a plan as testified to by Craig & Blake? All of plaintiff's witnesses, and all of Corning & Co.'s who on cross-examination testified on the subject, agreed that among drinkers at public drinking places no one had ever called for "Canadian Type" whisky, or had ever knowingly drunk it. There is no exception to this condition throughout the country, unless it is established by Corning & Co.'s New York depositions. The witnesses were of two kinds: First, saloon keepers, with negro trade, said some of their customers called for "Canadian Type." These were in the main the same witnesses whose oral testimony was rejected by Judge Hand. I cannot readily believe that their clientèle displayed a nice discrimination, which was found nowhere else in the land. Second, owners of "family liquor stores" testified that they sold some of Corning & Co.'s said whisky in bottles bearing "Canadian Type" labels. But that does not prove that a single ultimate consumer ever wanted, or knew that he was drinking, Corning & Co.'s said whisky.

When plaintiff notified Corning & Co. that "Canadian Type" was being palmed off by retailers for "Canadian Club," Corning & Co took the position that, so long as no misrepresentations were made to their immediate purchasers, the wholesalers and jobbers, they could sell as they pleased. I find that Corning & Co. had both actual and constructive notice that their said whisky was being sold to unknowing consumers by means of the refilling of "Canadian Club" bottles.

To the situation hereinabove found the equitable doctrine of contributory infringement plainly applies, in my judgment.

On barrel heads Corning & Co. stamped "Canadian Type." With the bulk sales Corning & Co. supplied engraved labels and "bar bottles" bearing the words "Canadian Type." These labels are made to simulate plaintiff's. There is no evidence respecting the quantity of labels and "bar bottles" furnished by Corning & Co. as compared with the quantity of said whisky sold. Of course there was no intent to deceive wholesalers and jobbers, and they were not misled. But the labels, etc., which informed them, manifestly were not furnished to retailers, or at least not conspicuously used by them, for consumers have never come to know of Corning & Co.'s "Canadian Type."

I find it unnecessary, on the facts of this case, to inquire whether the words "Canadian Type" in and of themselves constitute an infringement of plaintiff's trade-mark. If in the public mind the word "Canadian" had acquired a meaning indicating plaintiff's whisky, so that plaintiff has a proprietary interest in that geographical word, as the Elgin Watch Company has in "Elgin," and if "Canadian Type" means in the public mind "Imitation Canadian," then an interesting question might arise, whether a trader should be permitted to administer poison, even if he accompanies it with an antidote.

The decree will be limited to restraining the trespasses hereinabove found and to an accounting therefor.